1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THE ESTATE OF DEMETRIUS
STANLEY, et al.,

           Plaintiffs,

       v.

CITY OF SAN JOSE, et al.,

           Defendants.

Case No.  22-cv-03000-VKD

**ORDER (1) GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT; AND (2) DENYING
PLAINTIFFS' MOTION TO SEAL**

Re: Dkt. Nos. 38, 41

This action arises out of a May 31, 2021 deadly encounter between San Jose police officers and Demetrius Stanley, who was at the time the subject of a covert reconnaissance operation. Plaintiff Mimi Lebreton sues for herself and on behalf of the estate of her son, decedent Mr. Stanley, asserting civil rights violations pursuant to 42 U.S.C. § 1983, as well as several state law claims for relief.  In the original complaint, plaintiffs named as defendants the City of San Jose ("City") and Officers Anthony Baza and Hans Jorgensen.  The complaint asserted five claims for relief, four of which were brought on behalf of Mr. Stanley's estate.  The complaint asserted claims on Mr. Stanley's behalf against Officer Baza for excessive force in violation of the Fourth Amendment, 42 U.S.C. § 1983 (claim 1); against the City and Officer Baza for violation of the California Bane Act, Cal. Civ. Code § 52.1 (claim 3); against the City and Officer Baza for battery (claim 4); and against all defendants for negligence/wrongful death (claim 5).  Ms. Lebreton also asserted a Fourteenth Amendment claim against Officer Baza for familial loss, 42 U.S.C. § 1983 (claim 2).  *See* Dkt. No. 1.

All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 14,

United States District Court
Northern District of California

16.

The Court granted in part and denied in part defendants' Rule 12(b)(6) motion to dismiss the complaint. Dkt. No. 29. The sole claim asserted against Officer Jorgensen was dismissed without leave to amend. The Court otherwise denied defendants' motion to dismiss in all other respects. *Id.*

The City and Officer Baza, the remaining defendants, now move for summary judgment on all claims for relief. Dkt. No. 38. Plaintiffs stipulate that Officer Baza is entitled to qualified immunity on their Fourth and Fourteenth Amendment claims. Dkt. No. 39 at 8 n.1. They also concede the motion for summary judgment on the Bane Act claim. *Id.* Accordingly, with respect to plaintiffs' first, second, and third claims for relief, defendants' motion for summary judgment is granted as unopposed.

Plaintiffs oppose the motion for summary judgment only with respect to the claims, brought on behalf of Mr. Stanley's estate, against the City and Officer Baza for battery (claim 4) and for negligence/wrongful death (claim 5). *Id.* With respect to those remaining claims for relief, upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court denies defendants' motion for summary judgment.[1]

## I.    BACKGROUND

The following background facts are undisputed.

On the evening of May 31, 2021, Officers Baza and Jorgensen were in a San Jose residential neighborhood on Tofts Drive, conducting covert reconnaissance of Mr. Stanley's residence in order to gather information in advance of a planned arrest of Mr. Stanley the next day. Mr. Stanley had an outstanding arrest warrant for a March 2021 armed robbery of a teenager in his

---

[1] Defendants request that if the Court concludes that they are not entitled to summary judgment on plaintiffs' remaining state law claims, then the Court should decline to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367. *See* Dkt. No. 38 at 21-22; Dkt. No. 42 at 13. The Court's discretion to exercise jurisdiction over plaintiffs' remaining state law claims is informed by principles of economy, convenience, fairness, and comity, and not, as defendants suggest, on the Court's determination of whether defendants should win or lose their motion for summary judgment on those claims. *See* 28 U.S.C. § 1367(c). The Court finds no basis under § 1367(c) to decline supplemental jurisdiction over the remaining claims for relief.

United States District Court
Northern District of California

neighborhood.  *See* Dkt. No. 38-1, Ex. B; Dkt. No. 38-3 ¶¶ 3-6.

Officers Baza and Jorgensen are members of the San Jose Police Department's Covert Response Unit ("CRU").  At the time of the incident, Officer Baza had been working with CRU for a few weeks, although both he and Officer Jorgensen had worked as police officers in various assignments for about fifteen years.  *See* Dkt. No. 38-4 ¶¶ 2-6; Dkt. No. 38-5 ¶ 2; Dkt. No. 39-9, Ex. 3 (Dkt. No. 39-3, Baza Dep. at 19:5-7)).  CRU is a police plain-clothes assignment that specializes in the surveillance/reconnaissance[2] and apprehension of high-threat level violent subjects.  *See* Dkt. No. 38-2 ¶ 3; Dkt. No. 38-3 ¶ 2; Dkt. No. 38-4 ¶ 3; Dkt. No. 38-5 ¶ 3; Dkt. No. 39-3 (Baza Dep. at 16:9-21)  To increase the chances that an arrest will be successful, and carried out as safely as possible, CRU's standard operating procedure is to conduct surveillance/reconnaissance of a subject the day before a planned arrest.  *See* Dkt. No. 38-2 ¶ 4; Dkt. No. 38-3 ¶ 9.  Indeed, Officer Baza avers that, "the majority of the time in CRU is spent on surveillance and we do not attempt an arrest until we believe we can do it safely."  Dkt. No. 38-5 ¶ 3.  With respect to Mr. Stanley, CRU's plan for May 31, 2021 was to conduct only covert reconnaissance; there was no plan to contact or apprehend him that day.  *See* Dkt. No. 38-2 ¶ 6; Dkt. No. 38-3 ¶ 9; Dkt. No. 38-4 ¶ 7; Dkt. No. 38-5 ¶¶ 5-6; Dkt. No. 39-1 (Lopez Dep. at 7:17-19).

Officer Alvaro Lopez prepared CRU's operational plan for the reconnaissance of Mr. Stanley's residence and his subsequent apprehension.  Dkt. No. 38-3 ¶ 8; *see also* Dkt. No. 38-1, Ex. C.  A records check revealed that Mr. Stanley had a violent criminal history, including prior arrests for battery, domestic violence, assault with a firearm, first degree robbery, criminal threats, illegal possession of a firearm, robbery, and assault with a deadly weapon.  Dkt. No. 38-3 ¶ 7.  Officer Lopez included Mr. Stanley's criminal history in the CRU operational plan.  Dkt. No. 38-1, Ex. C.  He also noted that Mr. Stanley was prohibited from having the firearm seized in connection with the March 2021 armed robbery, and further stated that "[b]ased on [Mr. Stanley's]

---

[2] Officer Jorgensen states that although "surveillance" and "reconnaissance" are sometimes used interchangeably, CRU generally uses the term "surveillance" to mean observation of a suspect, which may occur over a prolonged period, whereas "reconnaissance" refers to shorter-term information-gathering activities.  *See* Dkt. No. 38-4 ¶ 7.

United States District Court
Northern District of California

prior offenses[,] it is likely that he may be in possession of additional firearms."  *Id.* at ECF 20;
*see also id.*, Ex. A at ECF 5; Dkt. No. 38-3 ¶ 6.  The operational plan included recent photographs
of Mr. Stanley, his address, vehicles and license plates associated with him, and a summary of the
March 2021 armed robbery incident that was the subject of the outstanding arrest warrant.  Dkt.
No. 38-1, Ex. C; Dkt. No. 38-3 ¶ 8.

After completing the operational plan, Officer Lopez submitted it to Sergeant Mark
Johnston, who approved the plan.  Dkt. No. 38-2 ¶ 4; Dkt. No. 38-3 ¶ 8.  Officer Lopez and
Sergeant Johnston discussed that the plan would involve reconnaissance of Mr. Stanley's
residence, followed by his arrest the next day.  Dkt. No. 38-2 ¶¶ 4, 6; Dkt. No. 38-2 ¶ 9.  The
purpose of the reconnaissance was to gather information, observe the area surrounding Mr.
Stanley's residence, confirm vehicles and license plates, and identify Mr. Stanley and anyone else
at the residence.  Dkt. No. 38-2 ¶ 4; Dkt. No. 38-3 ¶ 9.  Sergeant Johnston planned to attend a
briefing session to be held at a separate location near the residence and to remain near the
residence during the reconnaissance.  Dkt. No. 38-2 ¶ 5.

After discussing the operational plan with Sergeant Johnston, Officer Lopez sent a
notification to the CRU team at around 4:00 p.m. on May 31, 2021, asking who was available to
assist with the reconnaissance of Mr. Stanley's residence that evening.  Dkt. No. 38-2 ¶ 5; Dkt.
No. 38-3 ¶¶ 10, 11.  Several officers responded that they were available, including Officers Baza
and Jorgensen.  Dkt. No. 38-3 ¶ 10; Dkt. No. 38-4 ¶ 6; Dkt. No. 38-5 ¶ 4.

Officer Baza, who was not scheduled to work that day, drove to the briefing location near
Mr. Stanley's residence in his unmarked police vehicle, a Chevrolet Traverse SUV.  That vehicle
has tinted windows, except for the front windshield, which is clear glass.  Dkt. No. 39-2
(Jorgensen Dep. at 70:18-23); *see also* Dkt. No. 41-3, Ex. 6.  Before Officer Baza arrived, Officer
Lopez briefed him over the phone.  Dkt. No. 38-3 ¶ 12; Dkt. No. 38-5 ¶¶ 4-5.  During that phone
call, Officer Lopez read to Officer Baza the entire operational plan, including the case summary,
Mr. Stanley's physical description, his criminal history, the active arrest warrant, and the
assessment that Mr. Stanley likely had other firearms.  Dkt. No. 38-3 ¶ 12; Dkt. No. 38-5 ¶ 5.

Officer Baza was the first to arrive near the briefing location and met with Officer Lopez,

who gave him a photo of Mr. Stanley and directed him to conduct "fixed" reconnaissance at the front of Mr. Stanley's residence on Tofts Drive.  Dkt. No. 38-3 ¶ 12; Dkt. No. 38-5 ¶ 6.  In conducting "fixed" reconnaissance, Officer Baza would remain in front of the residence in his vehicle.  He understood that his role was to relay to other officers the information gathered at the scene, warn of any threats he could see, and be the "rescue," i.e., assist or protect other officers on the scene in an emergency, including providing lethal cover, if necessary.  Dkt. No. 38-5 ¶ 7; Dkt. No. 39-3 (Baza Dep. at 18:18-23); *see also* Dkt. No. 39-8 (Flores Dep. at 15:10-17).

Officer Jorgensen was the next to arrive.  He also drove an unmarked police vehicle, a black Dodge Caravan.  Officer Jorgensen also received a briefing from Officer Lopez by phone.  Dkt. No. 38-3 ¶ 14; Dkt. No. 38-4 ¶¶ 8, 11.  During that briefing, Officer Lopez provided Officer Jorgensen with Mr. Stanley's photo and read to him the entire operational plan, including the case summary, Mr. Stanley's physical description, his criminal history, the active arrest warrant, and noted that Mr. Stanley likely had other firearms.  Dkt. No. 38-3 ¶ 14; Dkt. No. 38-4 ¶¶ 6-9.  As part of the reconnaissance plan for that evening, Officer Jorgensen states that Officer Lopez instructed him to obtain license plate numbers associated with Mr. Stanley's residence, to ascertain if any vehicle associated with Mr. Stanley was present at the residence, and to "'get a lay of the land' in the event it was appropriate for CRU officers to perform a surround and call out at the residence over the course of the next few days."  Dkt. No. 38-4 ¶¶ 7, 11; *see also* Dkt. No. 38-3 ¶ 14; Dkt. No. 39-2 (Jorgensen Dep. at 17:24-18:9).

Officer Lopez sent Officer Jorgensen to assist Officer Baza at Mr. Stanley's residence, ahead of the rest of the CRU team, "to do a drive-by of the residence," "to see if the primary suspect vehicle was at that address," and "to conduct surveillance at the residence until [Officer Lopez] finished briefing the rest of the team and [the team] join[ed] [Officers Jorgensen and Baza]" at the reconnaissance.  Dkt. No. 38-3 ¶ 14; Dkt. No. 38-4 ¶ 10; Dkt. No. 39-1 (Lopez Dep. at 6:23-7:12).  In a declaration, Officer Lopez states that "[i]t is common to begin information gathering reconnaissance with a limited number of CRU officers."  Dkt. No. 38-3 ¶ 15.  Officer Jorgensen similarly states that "[i]t is not uncommon for CRU officers to show up at different times depending on where they are coming from and other commitments they may have had" and

1    "[t]here is no requirement that a certain number of officers participate in a reconnaissance or

2    surveillance mission."  Dkt. No. 38-4 ¶ 10.

3         Officer Lopez's operational plan does not specify that any officers would be sent ahead of

4    the rest of the CRU team to conduct reconnaissance/surveillance at Mr. Stanley's residence.  *See*

5    Dkt. No. 38-1, Ex. C.  In deposition, Officer Lopez and Sergeant Johnston both testified that they

6    did not recall that Officer Lopez obtained Sergeant Johnston's approval to send two officers ahead

7    of the rest of the team to begin reconnaissance on their own.  Dkt. No. 39-1, Lopez Dep. at 9:17-

8    24); Dkt. No. 39-4 (Johnston Dep. at 6:11-25).  In a declaration submitted in support of the present

9    motion for summary judgment, Sergeant Johnston attests that Officer Lopez told him that "he

10   would likely send a couple of officers to initially go to the suspect's home" to begin gathering

11   information.  Dkt. No. 38-2 ¶ 5.  Sergeant Johnston also states that as he prepared to go to the

12   briefing location, he was aware of the reconnaissance that was being conducted.  *Id*.[3]  According

13   to Sergeant Johnston, "this staggered approach to deploying units to pre-arrest fact gathering

14   reconnaissance was standard operating procedure for CRU and utilized in most pre-arrest

15   operations."  *Id*.  Officer Lopez also notes that he "had constant radio communication with Officer

16   Baza," and that Sergeant Johnston "was also aware of what was happening and was monitoring

17   our work over the radio."  Dkt. No. 38-3 ¶ 16.

18        Officer Baza was the first to arrive on Tofts Drive at around 9:30 p.m.  He sat in his

19   unmarked police vehicle, about two houses west of Mr. Stanley's home, facing the residence.

20   Dkt. No. 38-5 ¶ 8.  Officer Jorgensen, who arrived about fifteen minutes later, parked his

21   unmarked police vehicle around the corner on Pembroke Drive, a nearby cross-street located west

---

[3] For the first time at oral argument, plaintiffs asserted that Sergeant Johnston's declaration is a "sham."  Under the Ninth Circuit's "sham affidavit" rule, a "party cannot create an issue of fact by an affidavit contradicting . . . prior deposition testimony."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  The rule is triggered when the court determines that the declaration or affidavit is a sham, and the inconsistency between the deposition testimony and a subsequent declaration or affidavit is "clear and unambiguous."  *Id*.  There is no inconsistency between Sergeant Johnston's deposition testimony that he did not recall whether Office Lopez sought his approval to send officers ahead to conduct reconnaissance, and his subsequent declaration that Officer Lopez told him that he would likely send two officers ahead to begin reconnaissance and that Sergeant Johnston was aware of the reconnaissance that was being conducted.  Sergeant Johnston's declaration is not a "sham."

United States District Court
Northern District of California

of Mr. Stanley's residence.  *See* Dkt. No. 38-4 ¶ 11; Dkt. No. 41-3, Ex. 6.  Officer Baza did not see where Officer Jorgensen parked on Pembroke Drive because Officer Baza was in his vehicle facing east on Tofts Drive.  Dkt. No. 39-3 (Baza Dep. at 47:18-21).

Both Officers Baza and Jorgensen were dressed in plain clothes, so as not to reveal their identities as police officers.  Specifically, Officer Baza wore a T-shirt, jeans, and a hat; Officer Jorgensen wore a T-shirt and gym shorts.  *See* Dkt. No. 38-5 ¶ 8; Dkt. No. 39-2 (Jorgensen Dep. at 11:8-11, 13:17-20); Dkt. No. 41-3, Ex. 6.  Both officers had their tactical vests (marked "POLICE" across the top front of the vest) in their vehicles, along with their police-issued firearms.  *See* Dkt. No. 38-4 ¶ 16; Dkt. No. 38-5 ¶ 11; Dkt. No. 39-2 (Jorgensen Dep. at 12:16-20, 68:11-12); Dkt. No. 39-3 (Baza Dep. at 36:1-21)); Dkt. No. 41-3, Ex. 6.  Officer Baza also had a police rifle laying on the floor of the passenger-side of his vehicle.  *See* Dkt. No. 39-3 (Baza Dep. at 44:24-45:1)).  As he sat in his vehicle, Officer Baza had his concealed firearm inside his waistband.  *See* Dkt. No. 39-3 (Baza Dep. at 37:3-9, 45:2-4).  During the reconnaissance, Officer Baza assumed incorrectly that Officer Jorgensen likewise had his concealed firearm on his person. He did not know that Officer Jorgensen was, in fact, unarmed.  *See* Dkt. No. 39-3 (Baza Dep. at 48:15-19); Dkt. No. 39-2 (Jorgensen Dep. at 12:16-24).

At some point, it was decided that Officer Jorgensen, who was dressed like a neighborhood jogger, would conduct reconnaissance by walking past Mr. Stanley's residence, as gathering information about the home, vehicles, and license plates would be easier to conduct on foot, rather than from inside a moving vehicle.  It is not clear from the record whether walking on foot past the residence was something Officer Lopez instructed Officer Jorgensen to do or whether it was something Officer Jorgensen discussed only with Officer Baza.  Dkt. No. 38-5 ¶ 6; Dkt. No. 39-2 (Jorgensen Dep. at 13:17-20, 17:24-18:9, 29:24-30:11; 36:9-15); Dkt. No. 39-3 (Baza Dep. at 46:3-13, 47:3-5).  Officer Jorgensen did not discuss this decision with Sergeant Johnston, as he believed Officer Lopez had obtained approval for officers to conduct reconnaissance in this manner.  *See* Dkt. No. 39-2 (Jorgensen Dep. at 18:10-14; 19:2-4; 19:24-20:18).  Officer Baza testified that although Officer Lopez did not specifically say whether he had spoken with Sergeant Johnston, Officer Baza understood that all CRU activities required approval by a supervisor.  *See*

1  Dkt. No. 39-3 (Baza Dep. at 39:21-40:2; 41:24-42:4).

2  After parking on Pembroke Drive, Officer Jorgensen exited his vehicle in his gym attire,

3  with his keys in a pocket, a cellphone in one hand, and a seven-inch night-vision monocular in the

4  other hand.  Dkt. No. 38-4 ¶ 12; Dkt. No. 39-2 (Jorgensen Dep. at 42:10-14, 21-23; 43:12-14;

5  44:13-22).  He turned right on Tofts Drive and began his reconnaissance by walking on the south

6  sidewalk of Tofts Drive, past Mr. Stanley's residence.  Dkt. No. 38-4 ¶ 12; Dkt. No. 39-2

7  (Jorgensen Dep. at 49:6-11).  During this time, Officer Jorgensen maintained cellphone contact

8  with Officer Baza and held his cellphone on his ear.  Dkt. No. 38-4 ¶ 12; *see also* Dkt. No. 39-2

9  (Jorgensen Dep. at 43:12-13).  Officer Jorgensen noted that the porch light of Mr. Stanley's

10  residence was on.  Dkt. No. 38-4 ¶ 12; *see also* Dkt. No. 39-2 (Jorgensen Dep. at 54:16-17).  After

11  walking one or two houses past Mr. Stanley's residence, Officer Jorgensen crossed the street to the

12  north side of Tofts Drive.  He used his night-vision device to see if there were any cameras on Mr.

13  Stanley's residence and to verify that the house matched the one provided in the CRU operational

14  plan.  Dkt. No. 38-4 ¶ 12; *see also* Dkt. No. 39-2 (Jorgensen Dep. at 53:25-54:14).  After

15  observing that there were no cameras on the residence, and that a vehicle matching Mr. Stanley's

16  car was parked in the driveway, Officer Jorgensen crossed back to the south side of Tofts Drive

17  and used his cellphone light to illuminate the license plates of vehicles parked on the street.  Dkt.

18  No. 38-4 ¶ 12; Dkt. No. 39-2 (Jorgensen Dep. at 14:6-15:2; 56:24-57:18).  As he collected license

19  plate numbers, Officer Jorgensen read them aloud to Officer Baza over his cellphone.  Dkt. No.

20  38-4 ¶ 12.  From his peripheral vision, Officer Jorgensen then noted that as he passed Mr.

21  Stanley's residence, the porch light for the home turned off, and he simultaneously detected

22  movement from the front porch area.  *Id.*; *see also* Dkt. No. 39-2 (Jorgensen Dep. at 57:19-21;

23  58:15-21).  Officer Jorgensen was concerned that the porch light turning off meant that Mr.

24  Stanley may have seen him.  In order to avoid further suspicion, Officer Jorgensen did not look in

25  the direction of Mr. Stanley's residence and continued walking down Tofts Drive toward

26  Pembroke Drive.  Dkt. No. 38-4 ¶ 12; Dkt. No. 39-3 (Jorgensen Dep. at 58:22-59:20).

27  From his vantage point in his vehicle on Tofts Drive, Officer Baza could see Mr. Stanley's

28  residence, the driveway area, and the walkway leading to the front door.  Dkt. No. 39-3 (Baza

1   Dep. at 45:9-14).  Officer Baza was able to observe that the front porch light of the residence was

2   on; he also noticed when that light later turned off while Officer Jorgensen was in front of the

3   residence.  Dkt. No. 38-5 ¶ 8; Dkt. No. 39-3 (Baza Dep. at 45:15-17; 54:14-17).  Officer Baza

4   avers that after the porch light went out, he told Officer Jorgensen that it was probably time to

5   leave, as they were not there to contact or apprehend Mr. Stanley at that time.  Dkt. No. 38-5 ¶ 8;

6   *see also* Dkt. No. 39-3 (Baza Dep. at 54:18-55:1; 55:11-20).

7          Officer Baza saw someone come out of Mr. Stanley's residence.  Dkt. No. 39-3 (Baza Dep.

8   at 55:22-56:1).  He informed Officer Jorgensen, and also broadcast over the radio, that someone

9   exited the residence.  *Id*.  Officer Jorgensen began jogging, still heading west on Tofts Drive

10  toward Pembroke Drive.  Dkt. No. 38-4 ¶ 13; Dkt. No. 39-3 (Baza Dep. at 56:1-4).  Officer Baza

11  observed that the person who exited the residence was also approaching his vehicle, heading west

12  on Tofts Drive, approximately 25 to 30 feet behind Officer Jorgensen.  Dkt. No. 38-5 ¶ 9.  Officer

13  Baza observed that the person appeared to be running at about the same speed as Officer

14  Jorgensen and was keeping pace with him.  *Id*.  When that person was approximately 25 feet away

15  from his vehicle, Officer Baza says that he saw something in the person's right hand.  *Id*. ¶¶ 9, 10;

16  Dkt. No. 39-3 (Baza Dep. at 55:23-24).  Although he could not positively identify the person at

17  that time, Officer Baza believed that it could be Mr. Stanley; he also thought that the object in his

18  hand could be a handgun "because the silhouette of it protruded forward out of his hand, the way

19  the muzzle of a gun would do."  Dkt. No. 38-5 ¶ 10; *see also* Dkt. No. 39-3 (Baza Dep. at 57:16-

20  25).

21         After Officer Baza told Officer Jorgensen that there was a male from the house following

22  him, Officer Jorgensen began jogging a little faster.  Dkt. No. 38-4 ¶ 13.  Officer Baza then told

23  Officer Jorgensen that the male following him had a gun, and Officer Jorgensen began sprinting

24  toward Pembroke Drive.  *Id*.; Dkt. No. 39-2 (Jorgensen Dep. at 61:8-15).  At this time, Officer

25  Jorgensen was about 5 to 10 yards away from Officer Baza's vehicle, but had not yet passed it.

26  Dkt. No. 39-2 (Jorgensen Dep. at 61:10-18).  Officer Baza estimates that the male who exited the

27  home was now about 10 yards behind Officer Jorgensen, and that all of this occurred within about

28  5 to 10 seconds.  *See* Dkt. No. 39-3 (Baza Dep. at 57:5-15).

United States District Court
Northern District of California

As he ran past Officer Baza's vehicle, Officer Jorgensen says that he heard what he thought was a handgun being "racked," i.e., the act of manipulating the slide of a handgun to load a round in the chamber. Dkt. No. 38-4 ¶ 13. Believing that the man with the handgun might try to shoot him, Officer Jorgensen shifted to a full sprint from Tofts Drive to Pembroke Drive, thinking that he might use a parked car on Pembroke Drive as cover if the person started shooting. *Id*.; Dkt. No. 39-2 (Jorgensen Dep. at 62:22-63:8). However, Officer Jorgensen says that a few seconds after turning onto Pembroke Drive, he realized that the person was no longer chasing him. Dkt. No. 38-4 ¶ 14. Indeed, surveillance footage from a neighboring home appears to show that after Officer Jorgensen ran northbound onto Pembroke Drive, Mr. Stanley stopped following him, and instead stepped from the sidewalk into the street on Tofts Drive and headed back in the direction of his residence. *See* Dkt. No. 38-1, Ex. F.

Officer Jorgensen "never communicated with Officer Baza to rescue [him]"; and, while he says that he "was initially concerned that the man might shoot at [him]," Officer Jorgensen says he "never believed [he] was in imminent danger or needed to be rescued." Dkt. No. 38-4 ¶ 14. Believing that he "had successfully de-escalated the situation," Officer Jorgensen avers that "there was no need to escalate it by having Officer Baza announce his presence as a police officer to an armed man." *Id*.

Up until the point he broke into a full sprint, Officer Jorgensen was still on the phone with Officer Baza and had his phone on his ear. As he broke into a full sprint, Officer Jorgensen put his phone down by his side. Dkt. No. 39-2 (Jorgensen Dep. at 63:20-64:5). After Officer Jorgensen turned the corner onto Pembroke Drive, he put his phone back up to his ear and heard Officer Baza say, "I don't know where he went." *Id*. (Jorgensen Dep. at 65:3-8). Officer Jorgensen continued running and heard two shots, followed by one or two more. *Id*. (Jorgensen Dep. 65:8-10).

Meanwhile, Officer Baza says that shortly after Officer Jorgensen ran past his vehicle on Tofts Drive, he observed that the person who appeared to be chasing Officer Jorgensen was now approaching the front end of Officer Baza's vehicle. Dkt. No. 38-5 ¶ 11. As that person reached the front corner of his vehicle, Officer Baza says that he "saw the person make the motion with his

hand that one would make while racking a round into the gun" and "simultaneously hear[d] a sound that was identical to the sound of a handgun racking a round into the chamber." *Id.*  It was at that point that Officer Baza says he "was certain that the object the person was carrying was a gun." *Id.*; Dkt. No. 39-3 (Baza Dep. at 58:11-16).  He states that he "immediately grabbed [his] vest, which was next to [him] on the front passenger seat, and began putting it on," while "still trying to keep track of both Officer Jorgensen and the person," "watching for other people exiting the house, and communicating with the [CRU] team on the radio." Dkt. No. 38-5 ¶¶ 11, 12; Dkt. No. 39-3 (Baza Dep. at 61:10-17).  Officer Baza did not retrieve his helmet, which was out of his reach, because he did not believe he had time to do so.  Dkt. No. 38-5 ¶ 11.  He also did not turn on his body-worn camera at that time "because it emits a red blinking light when recording and the person might figure out that [he] was a police officer," which Officer Baza felt "could escalate the conflict with this person or compromise the operation if the person was Mr. Stanley." *Id.*

Officer Baza states that by the time he got his vest on, he lost sight of both Officer Jorgensen and the person who appeared to be chasing him.  Dkt. No. 38-5 ¶ 12.  Officer Baza states that he "grabbed [his] rifle off the front passenger seat because [he] feared [he] might need to intervene to rescue Officer Jorgensen." *Id.*  He "was concerned that Officer Jorgensen could get shot and, at that point, Officer Jorgensen's safety was more important than the covert reconnaissance." *Id.*  Officer Baza says that he began looking in his side mirrors[4] and through his windows for Officer Jorgensen and the person who appeared to be chasing him.  He believed that Officer Jorgensen had run onto Pembroke Drive, but he did not know where the other person was. *Id.*; Dkt. No. 39-3 (Baza Dep. at 63:25-64:17).  At that point, Officer Baza says that he was no longer communicating with Officer Jorgensen by phone, but "was communicating to other CRU officers over the radio that there was a subject running with a gun in hand." Dkt. No. 38-5 ¶ 12. He remained in his vehicle, looking for Officer Jorgensen and the person who appeared to be chasing him with a gun, watching the residence, and trying to contact Officer Jorgensen to confirm

---

[4] In deposition, Officer Baza stated that his rear view was blocked by a car parked behind him, and agreed that the mirrors available to him were his side mirrors.  Dkt. No. 39-3 (Baza Dep. at 64:10-17).

United States District Court
Northern District of California

that Officer Jorgensen was okay.  *Id.*; Dkt. No. 39-3 (Baza Dep. at 61:22-62:8; 67:10-16; 68:1-7).

Officer Baza says that he saw Officer Jorgensen turn northbound onto Pembroke Drive. Dkt. No. 39-3 (Baza Dep. at 69:11-15).  Although he did not know exactly where Officer Jorgensen was, Officer Baza says that he did not hear any shots, and Officer Jorgensen did not communicate that he needed a rescue or assistance.  Dkt. No. 38-5 ¶ 13.  Officer Baza concluded that Officer Jorgensen was not in imminent danger, and that "there was no need to confront the person with the gun by activating lights and siren."  *Id.*  Officer Baza felt that doing so "would be very dangerous and could escalate the situation."  *Id.*  Because they were there that night only to conduct reconnaissance, Officer Baza says that he felt that the best way "to de-escalate the situation and not compromise the overall plan to arrest [Mr.] Stanley the next day was to let the person, who was possibly Mr. Stanley, return to his home."  *Id.*

Officer Baza says that several seconds later, through his driver-side window, he saw the person with the gun now walking east in the street on Tofts Drive, in the direction of Mr. Stanley's residence.  Dkt. No. 38-5 ¶ 14; Dkt. No. 39-3 (Baza Dep. at 69:24-70:3; 71:1-6).  As the person passed a few feet from Officer Baza's driver's door, Officer Baza says that he saw the person look into his driver's window.  Dkt. No. 38-5 ¶ 14; *see also* Dkt. No. 39-3 (Baza Dep. at 69:24-70:3).

As the person now walked past his car toward the residence, Officer Baza says that he believed that the person was just going to return to the house.  Officer Baza says that he "fully intended to let the person do that without engaging him at that time because, if that was Mr. Stanley, it would be much safer to try to surround the house (at a later time) with a lot more officers than to try and take on an armed suspect one-on-one."  Dkt. No. 38-5 ¶ 14.

However, as the person reached the front bumper of Officer Baza's vehicle, Officer Baza says that the person stopped and peered through his front windshield to look into the passenger compartment.  Dkt. No. 38-5 ¶ 15; Dkt. No. 39-3 (Baza Dep. at 73:5-9).  At that moment, Officer Baza and the person made eye contact, and based on the photo he had seen earlier in the evening, Officer Baza says that he was able to positively identify the person as Mr. Stanley.  Dkt. No. 38-5 ¶ 15; Dkt. No. 39-3 (Baza Dep. at 73:21-24).

Instead of returning to the residence, Officer Baza states that Mr. Stanley "suddenly

12

1  walked back towards [his] car door." Dkt. No. 38-5 ¶¶ 16, 17.  At this point, Officer Baza avers

2  that he "did not intend to announce [his] presence as a police officer and engage the lights and

3  sirens on [his] vehicle," as he felt that doing so "could have escalated any conflict."  *Id.* ¶ 16.

4  Additionally, Officer Baza says that he did not want to take his eyes off of Mr. Stanley, who he

5  believed was carrying a loaded handgun and was now quickly approaching.  *Id.*  By the time Mr.

6  Stanley walked toward Officer Baza's driver-side door, Officer Baza had his rifle across his lap,

7  pointed toward the door.  Dkt. No. 39-3 (Baza Dep. at 73:17-74:13).  Still, Officer Baza says that

8  he "believed the best course of action was to sit tight and hope that Mr. Stanley would merely look

9  in the window again and then head back to his house."  Dkt. No. 38-5 ¶ 16..

10  Mr. Stanley, however, opened the driver-side door of Officer Baza's vehicle.  Officer Baza

11  states that he could not see Mr. Stanley's hands at this point (because they were below the bottom

12  of the vehicle's window), but he believes that Mr. Stanley opened the door, which was unlocked,

13  with his left hand.  *Id.* ¶ 17.  Although Officer Baza had one prior experience where someone tried

14  to pull open his door, he states that "[t]his was very unusual behavior" and that he was not

15  expecting Mr. Stanley to open his door.  Dkt. No. 38-5 ¶ 17; Dkt. No. 41-3, Ex. 6.  Officer Baza

16  testified that as soon as Mr. Stanley opened his door, he "could see the gun in Mr. Stanley's right

17  hand and he was starting to bring it towards [Officer Baza]."  Dkt. No. 38-5 ¶ 17.  Officer Baza

18  further avers that "[a]t first the gun was at Mr. Stanley's waist, but he was raising the gun and

19  starting to point it at me and I believed [Mr. Stanley] was going to shoot me."  *Id.*; Dkt. No. 39-3

20  (Baza Dep. at 75:1-10).  Plaintiffs concede that Mr. Stanley opened Officer Baza's door while

21  raising his gun.  *See* Dkt. No. at 8:1-2; *see also* Dkt. No. 39-9, Ex. 5; Dkt. No. 38-1, Exs. F-H.

22  Officer Baza further states, "At that point, I felt my only option to save my life was to fire

23  my rifle at Mr. Stanley," "in part, because Mr. Stanley chased Officer Jorgensen away, racked a

24  round into the chamber, and then came back around and open[ed] my car door."  Dkt. No. 38-5

25  ¶ 18.  Additionally, in view of Mr. Stanley's history of armed robbery and assault with a deadly

26  weapon, and the outstanding warrant for the armed robbery of a teenager, Officer Baza says that

27  he "believed Mr. Stanley was very dangerous and had the ability and intent to kill me."  *Id.*; *see*

28  *also* Dkt. No. 39-3 (Baza Dep. at 75:11-12).  At oral argument, plaintiffs agreed that when Officer

United States District Court
Northern District of California

13

1   Baza shot him, Mr. Stanley was pointing his gun at Officer Baza.  *See* Dkt. No. 43.

2        Officer Baza shot Mr. Stanley twice in the chest.  Dkt. No. 38-5 ¶ 18; Dkt. No. 39-3 (Baza

3   Dep. at 38:22-29:4); Dkt. No. 38-1, Ex. E.  There is no evidence that Mr. Stanley said anything to

4   Officer Baza prior to the shooting.  Plaintiffs maintain that an audio recording reveals that Officer

5   Baza said, "Get the fuck out of here.  Police." *See* Dkt. No. 41-3, Ex. 7.; Dkt. No. 39-3 (Baza

6   Dep. at 71:16-72:5).  Officer Baza does not recall saying anything prior to the shooting, although

7   he also does not refute whatever may be established by the audio recording.[5]  Dkt. No. 39-3 (Baza

8   Dep. at 71:16-72:3).  Mr. Stanley fell to the ground.  Dkt. No. 38-5 ¶ 18.

9        After hearing the shots, Officer Jorgensen ran back toward Officer Baza, and saw him

10  standing next to his vehicle, holding his rifle, and wearing his police vest.  Dkt. No. 38-4 ¶ 16;

11  Dkt. No. 39-2 (Jorgensen Dep. at 66:4-14).  He also later located Mr. Stanley's gun under Officer

12  Baza's vehicle.  Officer Jorgensen handcuffed Mr. Stanley as he lay on the ground for security

13  reasons.  Dkt. No. 38-4 ¶ 17; Dkt. No. 39-2 (Jorgensen Dep. at 68:18-19).  Officer Baza got his

14  medical kit from his vehicle.  Officer Jorgensen attempted to render aid to Mr. Stanley, but Mr.

15  Stanley was pronounced dead at the scene a few minutes later.  Dkt. No. 38-4 ¶ 17; Dkt. No. 38-5

16  ¶ 19; Dkt. No. 39-2 (Jorgensen Dep. at 68:18-20).

17        Defendants move for summary judgment, arguing that plaintiffs do not have any evidence

18  creating a triable fact issue that Officer Baza's conduct made a violent situation more likely, or

19  that his use of deadly force was unreasonable.

## II.    LEGAL STANDARD

21        A motion for summary judgment should be granted if there is no genuine issue of material

22  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

23  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial

24  burden of informing the court of the basis for the motion, and identifying portions of the

25  pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

---

[5] The Court is unable to hear the statement plaintiffs attribute to Officer Baza on the audio recording they submitted as evidence.  But, as Officer Baza does not object to the recording or refute whatever might be captured on that recording, for present purposes the Court accepts as true plaintiffs' allegation about what Officer Baza said just prior to the shooting.

United States District Court
Northern District of California

absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See id*. at 1102.  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See id*.  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248-49.

### III.    DISCUSSION

#### A.    Plaintiffs' Motion to Seal

Plaintiffs move to seal an audio recording of Officer Baza's interview with investigators (Dkt. No. 39-9, Ex. 6), as well as portions of their opposition brief that reference information revealed in that interview (Dkt. No. 41-1 at 7:14-18 and 15:10-13).  There is a strong presumption in favor of access by the public to judicial records and documents accompanying dispositive motions that can be overcome only by a showing of "compelling reasons supported by specific factual findings." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) (internal quotation marks and citation omitted).  Plaintiffs' motion to seal is based on defendants' designation of the interview as confidential.  However, defendants filed no response to plaintiffs' motion to seal. *See* Civil L.R. 79-5(c)(1), (f)(3).  And at oral argument, defendants confirmed that the subject audio recording need not be sealed and may be placed in the Court's public records.

Accordingly, by **January 3, 2024** plaintiffs shall file the unredacted version of their opposition brief as a separate entry on the ECF public docket.  Plaintiffs' manually filed Exhibit 6

1   will also be made part of the public record.[6]

2   **B.   Claim 5: Negligence/Wrongful Death**

3   "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must

4   show that [the] defendant had a duty to use due care, that he breached that duty, and that the

5   breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57

6   Cal.4th 622, 629 (2013) (internal quotations and citation omitted).  In California, it is well settled

7   that "peace officers have a duty to act reasonably when using deadly force." *Id*.  Additionally,

8   "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force

9   are relevant considerations under California law in determining whether the use of deadly force

10   gives rise to negligence liability." *Id*. at 639.  The reasonableness of law enforcement personnel's

11   pre-shooting conduct "should not be considered in isolation," but rather "as *part of the totality of*

12   *circumstances* surrounding [a] fatal shooting[.]" *Id*. at 637.  Consideration of the "totality of the

13   circumstances surrounding any use of deadly force is broader than federal Fourth Amendment law,

14   which tends to focus more narrowly on the moment when deadly force is used." *Id*. at 639.  Thus,

15   conduct that may not give rise to liability under the Fourth Amendment's "reasonableness"

16   standard may nonetheless be negligent under California's "reasonable care standard." *Id*. at 638.

17   "Such liability can arise, for example, if the tactical conduct and decisions show, as part of the

18   totality of circumstances, that the use of deadly force was unreasonable." *Id*. at 639.

19   The parties do not dispute the material facts regarding the events leading up to the shooting

20   of Mr. Stanley, how those events unfolded, or how the shooting occurred.  Rather, they disagree

21   about what *should* have happened, and whether what actually happened was unreasonable, such

22   that Officer Baza's conduct gives rise to liability for negligence.  The parties offer competing

23   views about the duty of due care, including what was required by police policies and practices and

24   by Officer Baza's training.  The parties' disagreement focuses on two main points:  (1) whether

25   the CRU operational plan was flawed or negligent in its inception and execution; and (2) whether

26

27   ---

[6] The Clerk shall also maintain the parties' other manually filed exhibits (as to which no one has requested sealing) as part of the Court's public records.  *See* Defendants' exhibits, Dkt. No. 38-1,

28   Ex. F (Bates No. SJ03767), Ex. G (Bates No. SJ03769), and Ex. H (Bates No. SJ03769); Plaintiffs' exhibits, Dkt. No. 39-9, Exs. 5, 7.

United States District Court
Northern District of California

1   Officer Baza should have come out of cover and identified himself as a police officer during the

2   reconnaissance of Mr. Stanley's residence.

3         With respect to the first point of contention regarding the operational plan, plaintiffs

4   maintain that the decision to send Officers Baza and Jorgensen ahead of the rest of the CRU team

5   to begin reconnaissance, before Sergeant Johnston or any other team members arrived, was

6   contrary to police policies.  If there are any relevant written policies or rules, no one has submitted

7   them to the Court.  It is undisputed that Sergeant Johnston was not present at the time Officer

8   Lopez dispatched Officers Baza and Jorgensen to begin reconnaissance.  *See generally* Dkt. No.

9   38-2 ¶ 7.  The parties cite various pieces of evidence to support their positions regarding whether

10  or not Officer Lopez and Sergeant Johnston followed protocols and procedures, and did or did not

11  violate any standard practices or rules, in formulating or executing the operational plan.  *See, e.g.*,

12  Dkt. No. 41-1 at 2-3; Dkt. No. 42 at 10.  However, Officer Lopez and Sergeant Johnston are not

13  defendants in this matter.  While plaintiffs maintain that Officer Baza understood that CRU

14  activities required supervisor approval (*see* Dkt. No. 39-3 (Baza Dep. at 39:25-40:2)), they have

15  presented no evidence or authority that any of the alleged acts or omissions of Officer Lopez or

16  Sergeant Johnston properly are attributable to Officer Baza.  Plaintiffs argue that Officer Baza

17  should have inquired whether Sergeant Johnston approved of Officer Lopez's decision to send him

18  and Officer Jorgensen ahead to the reconnaissance.  *See* Dkt. No. 41-1 at 3.  Although plaintiffs'

19  expert, Roger Clark, opines that Officer Baza should have waited for other CRU team members

20  and "supervisor input" (*see* Dkt. No. 38-1, Ex. D at ECF 31), plaintiffs have presented no evidence

21  or authority establishing that Officer Baza had a duty to inquire whether Sergeant Johnston

22  approved Officer Lopez's decision to begin reconnaissance, or to refuse to conduct reconnaissance

23  as directed unless Sergeant Johnston was physically present.  To the extent plaintiffs' negligence

24  claim is premised on the alleged flawed formulation or execution of the operational plan, plaintiffs

25  have not shown that there is a triable issue or any evidence that would permit a reasonable jury to

26  find in their favor.

27         The second point of contention between the parties is whether Officer Baza should have

28  come out of cover and identified himself as a police officer during the reconnaissance of Mr.

United States District Court
Northern District of California

1    Stanley's residence.  Plaintiffs argue that there were several points when Officer Baza should have

2    identified himself as a police officer—namely, (1) when Mr. Stanley first came out of the house,

3    (2) when Officer Baza heard Mr. Stanley rack his gun while following Officer Jorgensen; and

4    (3) when Mr. Stanley looked into Officer Baza's windshield and made eye contact with him.  *See*

5    Dkt. No. 41-1 at 14-15.

6            In their papers, defendants principally argue that whether or not to come out of cover is a

7    decision that is within Officer Baza's discretion, and for which he is immune from liability under

8    California Penal Code § 196 and California Government Code § 820.2.  Relatedly, the City argues

9    that when an officer is immune from liability, then there can be no basis for municipal liability.

10   *See* Cal. Govt. Code § 815.2(b).  Defendants raised most of these defenses for the first time in

11   their opening motion for summary judgment.  Indeed, the claimed immunity under California

12   Government Code § 820.2 was asserted for the first time only in defendants' reply brief.  *See* Dkt.

13   No. 38 at 21; Dkt. No. 42 at 10-11.  Review of the docket indicates that defendants did not file an

14   answer to the complaint after the Court denied their Rule 12 motion to dismiss on November 9,

15   2022.  *See* Fed. R. Civ. P. 12(a)(4)(A) ("Unless the court sets a different time, . . . if the court

16   denies the [Rule 12] motion [to dismiss] or postpones its disposition until trial, the responsive

17   pleading must be served within 14 days after notice of the court's action.").  Defendants' asserted

18   statutory defenses do more than merely negate an element of plaintiffs' claims.  Generally,

19   immunities under the California Government Claims Act, Cal. Gov. Code § 810, *et seq.*, are

20   affirmative defenses to liability that may be forfeited if not timely raised.  *See generally Quigley v.*

21   *Garden Valley Fire Protection Dist.*, 7 Cal.5th 798 (2019); *see also Hampton v. California*, 83

22   F.4th 754, 772 (9th Cir. 2023) ("The analysis in *Quigley* dictates that the Government Claims Act

23   immunities on which Defendants rely are defenses to liability, not immunities from suit.").  *Cf.*

24   *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("[Defendant]'s attempt to

25   prove that it provided a reasonable accommodation merely negates an element that [plaintiff] was

26   required to prove and therefore was not an affirmative defense required to be pled in [defendant]'s

27   answer.").

28           "Even so, '[i]n the absence of a showing of prejudice . . . an affirmative defense may be

United States District Court
Northern District of California

raised for the first time at summary judgment.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1008 (9th Cir. 2019) (quoting *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993)). "There is no prejudice to a plaintiff where an affirmative defense would have been dispositive if asserted when the action was filed." *Id.* (internal quotations and citation omitted). "Rather, a party must point to a tangible way in which it was prejudiced by the delay." *Id.* at 1009 (internal quotations and citation omitted). Plaintiffs do not contend that they have been prejudiced in their ability to address these defenses on the merits. Accordingly, the Court finds that the defenses have not been waived or forfeited.

Although plaintiffs do not address Officer Baza's assertion of immunity under California Government Code § 820.2, defendants have not, in the first instance, sufficiently demonstrated that § 820.2 applies, as a matter of law, to the circumstances presented here. Section 820.2 provides that "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov. Code § 820.2 "'[A] 'workable definition' of immune discretionary acts draws the line between 'planning' and 'operational' functions of government." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Caldwell v. Montoya*, 10 Cal.4th 972, 981 (1995)). "'Immunity is reserved for those *basic policy decisions* which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly.'" *Id.* at 1160 (internal quotations omitted) (quoting *Caldwell*, 10 Cal.4th at 981). "'Such areas of quasi-legislative policymaking are sufficiently sensitive to call for judicial abstention from interference that might even in the first instance affect the coordinate body's decision-making process[.]'" *Id.* (internal quotations omitted) (quoting *Caldwell*, 10 Cal.4th at 981). "Almost all acts involve some choice among alternatives, and the statutory immunity thus cannot depend upon a literal or semantic parsing of the word 'discretion.'" *Caldwell*, 10 Cal.4th at 981. The California Supreme Court has cautioned that "courts should not casually decree governmental immunity; through a literal interpretation of 'discretionary' or otherwise, section 820.2 should not be made a catchall section broadly encompassing every judgment exercised at every level." *Johnson*, 69 Cal.2d at

798 (internal quotations and citation omitted).

While defendants assert that Officer Baza's decision to not identify himself as a police officer was "discretionary" (*see* Dkt. No. 42 at 11), they have not sufficiently demonstrated that the decision qualifies as a planning or policy determination that is "discretionary" within the meaning of § 820.2. Defendants are not aided by their reliance on *Bratt v. City & Cnty. of San Francisco*, 50 Cal. App. 3d 550 (1975), in which the court concluded that § 820.2 immunity applied to police officers' decision to engage in a high-speed pursuit, and there was no allegation that the officers conducted the pursuit in a negligent manner. Unlike *Bratt*, plaintiffs appear to contend that Officer Baza conducted the reconnaissance in a negligent manner, i.e., by failing to identify himself as an officer at several points during the operation.

With respect to defendants' asserted immunity under California Penal Code § 196, that statute forecloses civil liability for justifiable homicide. *See Martinez v. Cnty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996) ("There can be no civil liability under California law as the result of a justifiable homicide."); *see also id.* ("The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances "reasonably create[d] a fear of death or serious bodily harm to the officer or to another.") (internal quotations and citations omitted); Cal. Penal Code § 835a. Plaintiffs argue that Officer Baza's conduct was neither justified nor reasonable, and so the asserted immunity does not apply. Dkt. No. 41-1 at 17-18. Defendants do not dispute that a § 196 defense presupposes conduct that is justified or reasonable as a matter of law. However, defendants maintain that they are entitled to summary judgment because plaintiffs' arguments regarding Officer Baza's pre-shooting conduct are unsupported by any facts or evidence demonstrating that his decision not to identify himself as an officer made a deadly encounter more likely. *See* Dkt. No. 42 at 12-13. Plaintiffs insist that there are triable issues regarding whether Officer Baza should have come out of cover and announced his presence as a police officer on at least one of the three occasions identified above. *See* Dkt. No. 41-1 at 14-15, 17-18.

As noted above, the underlying facts are undisputed; the parties principally disagree about the inferences and conclusions to be drawn from the undisputed facts. While plaintiffs posit that

defendants negligently created a situation that ultimately resulted in Mr. Stanley's fatal shooting, it is not lost on the Court that Mr. Stanley came out of his house with a loaded gun, put a round in the chamber and—regardless of who he may have thought the officers were—chased after Officer Jorgensen with his loaded gun on a residential street, and then later opened Officer Baza's car door and pointed his gun at him.  These are significant facts that readily distinguish the present case from those plaintiffs principally rely on, in which it appears that law enforcement approached or initiated contact with subjects.[7]  Nor does the Court find persuasive plaintiffs' suggestion at oral argument that Mr. Stanley's conduct might be justified by the Second Amendment.  As noted above, the record indicates that Mr. Stanley was prohibited from possessing firearms.  Regardless, it is a questionable proposition to suggest that it is ordinary, reasonable, or acceptable for a resident to confront, with a loaded and racked gun, someone he observes looking into his or his family's cars—let alone that he has a *constitutional right* to do so.

Nevertheless, viewing the evidence favorably to plaintiffs and drawing all reasonable inferences in their favor, a jury could conclude that it was unreasonable for Officer Baza not to identify himself when Mr. Stanley racked his gun while following Officer Jorgensen, and Officer Baza believed that Officer Jorgensen could be shot.  It is undisputed that, as a general matter, officers are trained to come out of cover when a fellow officer is in danger and in need of a rescue.  *See* Dkt. No. 39-8 (Flores Dep. at 14:23-17:2).  Plaintiffs also cite Officer Baza's deposition testimony in which he stated that although he was armed with a concealed weapon and was worried that Officer Jorgensen might be shot, he first put on his vest and got his rifle, and then waited for updates from Officer Jorgensen regarding whether he was safe or not.  Dkt. No. 39-3 (Baza Dep. at 59:10-60:5, 61:13-62:8).

Defendants correctly note that as long as Officer Baza's conduct falls within the range of conduct that is reasonable under the circumstances, he is not required to choose the *most* reasonable course of action.  *See Hayes*, 57 Cal.4th at 632; *see also* Dkt. No. 42 at 6.  Officers

---

[7] *See Young Han v. City of Folsom*, 695 F. App'x 197 (9th Cir. 2017); *Biscotti v. Yuba City*, 636 F. App'x 419 (9th Cir. 2016); *Grudt v. City of Los Angeles*, 2 Cal.3d 575 (1970); *Howard v. Cnty. of Riverside*, No. EDCV 12-00700 VAP (OPx), 2014 WL 12589650 (C.D. Cal. May 7, 2014).

United States District Court
Northern District of California

Baza and Jorgensen have submitted declarations explaining why they believed there was no need to announce their presence, which they felt could escalate the situation and compromise the operation.  *See* Dkt. No. 38-4 ¶14; Dkt. No. 38-5 ¶¶ 11-13.  Additionally, defendants' expert, Lieutenant Morris, opines that no training would have required either officer to come out of cover under the circumstances presented.  Dkt. No. 38-1, Ex. D.

Although they retained Roger Clark, who provided a report of his opinions, plaintiffs failed to offer any competing expert opinion with their opposition to the present motion for summary judgment.  They belatedly requested leave to do so for the first time at the motion hearing, which request the Court subsequently granted.  *See* Dkt. Nos. 43, 44, 46.  In any event, Lieutenant Morris reproduced Mr. Clark's opinions in his own report which defendants offered in evidence.  Dkt. No. 38-1, Ex. D.  From that report, it appears that plaintiffs intend to offer Mr. Clark's competing view that when Officer Baza saw Mr. Stanley following Officer Jorgensen with a loaded gun, Officer Baza should have de-escalated the situation by engaging his lights and sirens to alert Mr. Stanley that they were police officers.  *See* Dkt. No. 38-1, Ex. D at ECF 27; *see also* Dkt. No. 46-1 at 8-9.  It appears that plaintiffs also intend to offer Mr. Clark's opinion that Officer Baza's conduct was not merely an inferior course of action, but rather an *unreasonable* one that was inconsistent with police policies and procedures and the duty of care Officer Baza owed to Mr. Stanley.  *See* Dkt. No. 38-1, Ex. D at ECF 27; *see also* Dkt. No. 46-1 at 8-9.  Although Lieutenant Morris states that Mr. Clark's opinions are incorrect and not well supported, the Court may not weigh an expert's conclusions or assume a factfinding role; the determination whether an expert is correct, or his opinions are corroborated by evidence are matters for a jury to decide.  *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020, 1026 (9th Cir. 2022).

Because there is a triable issue whether Officer Baza should have identified himself as a police officer when he saw Mr. Stanley following Officer Jorgensen with a loaded gun, defendants' motion for summary judgment on plaintiffs' negligence claim is denied.

### C.      Claim 4: Battery

"To prevail on a claim of battery under California law, a plaintiff must establish that: (1) the defendant touched the plaintiff or caused the plaintiff to be touched with the intent to harm

1   or offend the plaintiff; (2) the plaintiff did not consent to the touching; (3) the plaintiff was harmed

2   or offended by defendant's conduct; and (4) a reasonable person in plaintiff's situation would have

3   been offended by the touching." *Avina v. United States*, 681 F.3d 1127, 1130-31 (9th Cir. 2012).

4   A state law battery claim has been described as "a counterpart to a federal claim of excessive use

5   of force," in that for both kinds of claims "a plaintiff must prove that the peace officer's use of

6   force was unreasonable." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009); *see also*

7   *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) (A prima facie claim for battery "is

8   not established unless and until plaintiff proves unreasonable force was used.").

9         For the reasons discussed above, there are triable issues regarding the reasonableness of

10   Officer Baza's conduct that must be decided by a jury.  Accordingly, defendants' motion for

11   summary judgment on plaintiffs' battery claim is denied.

**IV.    CONCLUSION**

13         Based on the foregoing, defendants' motion for summary judgment is granted as

14   unopposed with respect to the claims on behalf of Mr. Stanley's estate for excessive force in

15   violation of the Fourth Amendment, 42 U.S.C. § 1983 (claim 1) and violation of the California

16   Bane Act, Cal. Civ. Code § 52.1 (claim 3), as well as Ms. Lebreton's Fourteenth Amendment

17   claim (claim 2).  Defendants' motion is otherwise denied with respect to the remaining claims for

18   battery (claim 4) and negligence/wrongful death (claim 5).

19         **IT IS SO ORDERED.**

20   Dated: December 22, 2023

Virginia K. DeMarchi
Virginia K. DeMarchi
United States Magistrate Judge

United States District Court
Northern District of California